Good morning. We have five cases on the calendar this morning, one from the Claims Court relating to a takings issue, two patent cases, one from the District Court, one from the ITC, a government employee case and a veterans case, and the latter two are being submitted on the briefs and will not be argued. So the first case is the State of E. Wayne Hague et al. v. United States, 2011, 5001, and 5013. Ms. Peterson. Thank you, Your Honor. May it please the Court, Elizabeth Ann Peterson for the United States. In this case, the Court of Federal Claims awarded in excess of $14 million in compensation and interest for regulatory and physical takings and for Mr. Hage's interest in permanent range improvement. Is it Hage? Hage, I believe. Hage. Yes. As we explained in our brief, Hage did not establish his entitlement to compensation on any of these cases. First, the CFC awarded compensation for a regulatory taking. To state a claim for a regulatory taking, Hage was required to show that his Reasonable Investment Act expectations in private property were entirely frustrated by government regulation to the extent that he was denied all economically viable use of them and that they were essentially appropriated by the government. But the property interest that Hage claimed here was water rights on federal rangeland and rights of way over federal land and he contended that the government regulated these to the point where he could not use them by virtue of streams and ditches becoming clogged with vegetation thanks to government policies. Were they required to request a permit for access to the ditches in question? All users of forest service lands have to request special use permits unless there's an exception. And there is an exception for routine maintenance of rights of way over federal rangelands for the maintenance of ditches, water ditches and other structures to convey water over the land. Hage did not believe that the kind of routine maintenance that was allowed without a permit was adequate for his maintenance. How do we know what kind of routine maintenance? What would constitute routine maintenance? Is there an opinion by the secretary? Is there some written notice of what constitutes routine maintenance? The forest service handbook at the time is now in regulation but the rule at the time was that minor trimming and pruning of vegetation to clear waterways with hand tools was allowable. Did it expressly say hand tools? Yes. Well, at the time it was a handbook provision and I cannot be sure that it said hand tools but anything disruptive that would potentially interfere with the other users of federal lands, enjoyment of those lands or disrupt the government property on them is subject to a special use permit requirement. And here there is an exception for minor pruning and trimming of vegetation in rights of way for the conveyance of water. Now Mr. Hage had on previous occasions obtained a special permit, is that right? That is correct, your honor. The record has copies of those. And when he obtained those special permits, were they so expressive to indicate, for example, what type of equipment he was allowed to take onto federal lands? How is the permit written? The permit merely says that he has the right to use and maintain the right of way. It does not, at least the example that is in our appendix, does not specify the means by which he can occupy the lands but it does specify the lands that he is permitted to use. In previous instances when he did receive a special permit, is there evidence in the record that on any of those occasions he drove, for example, a cat kind of bulldozer or some sort of, is there any record evidence of what he used in order to do it and whether or not it was objected to by the government or something like that? Mr. Hage's testimony is that he drove a D4 and a D6 cat on federal lands. These are vast tracts of land. These are large sort of bulldozing and or something like that kind of equipment that would help him clear the dishes, right? Correct, your honor. And so that's what he did pursuant to his special permits in the past? Presumably, your honor, I am not sure that the testimony actually makes that link. He does describe his use of those kinds of machinery and his belief that that is the kind of machinery necessary to clear the ditches that he claimed he owned under the 1866 Act. And the testimony shows that he did, prior to 1986, request and was granted permits to maintain ditches on, special use permits to maintain ditches on Forest Service land. What is your comment about the Court of Federal Claims conclusion that the fact that he did not request permits after 1986 was excusable because it was just a matter of futility? Well, as a matter of law, your honor, he was not entitled to the futility exception where he was never denied a permit. The only reason a permit application could be, the lack of a permit application could be excused as futile would be because the regulator already had denied a similar permit and there was no reason to believe that the outcome would be different. In other words, it was plainly not futile? It plainly was not futile, your honor. The record shows that he was granted permits when he requested permits. And it also shows that he did not believe he needed permits. So he defiantly declined to request permits and his claim, therefore, for the regulatory taking was unripe and the court should not have exercised it. What was the court's conclusion on physical taking? The physical taking theory he granted compensation on was that there were fences placed on certain meadows and areas where riparian portions of cages, grazing allotments were damaged. And there were inside those fenced areas, which were called exclosures, where certain of the water rights in which Hage claimed, waters in which Hage claimed rights, I should say, were located. But those fences did not prevent water from moving in its normal channels. The streams that were enclosed in part by fences also flowed above and below the fenced areas. So does that mean he had access to the water outside of the fences? This isn't a situation where, for example, it's a lake and the government erected a totally circumferential fence that prohibited all access at any point. Correct, your honor. And it's, I think, significant also that the... ...with the way that the government, for example, argued that access is irrelevant when accompanying a water right. Because it certainly is relevant in the example I just gave you, which is quite distinguishable from this case. Your honor, it isn't our argument that access is irrelevant. It is our argument that access is not a component of a water right. Well, how could it not be a component in the example I gave you? Don't take the harder battle, trust me on this one. Okay, I won't. It is distinguishable, your honor. Because otherwise, when you're talking about a lake and someone has water rights to a lake, if the government erects fencing that's totally circumferentially around the lake and prohibits them from accessing the water at any point ever, I don't see how you can conclude the government hasn't taken their water rights. I agree that that's the more difficult case and that the reason is because of the nature of Nevada water rights. But since we don't need to go there, I won't explain it. Was there a statute of limitations issue? There is a statute of limitations issue with respect to the fences which he complained about in the early 80s. There were later portable electric fences placed on his lands in 1991 in certain meadows in his allotments. So if he has a claim with respect to the erection of fences on the allotments on which he held permits, it would be as to those. Those were temporary and were removed seasonally and, as I said, did not prevent him from using the water because the cattle and his land had access to the water which moved along the lands. Did the animals tear the fences down? There is testimony from Mr. Page that the animals tore the fences down. That is all of the evidence about that. I'm not sure it's relevant to the question whether his water rights were taken since that was a temporary exclosure of just some of the United States lands, not his water which flowed above and below in both surface and underground channels. And then finally, he claimed compensation for permanent range improvements on federal lands. Now permanent range improvements, which is a specific category of things, it's not just building something. And permanent range improvements are allowed on the United States range lands but only where the Secretary has given permission for the construction or erection of such permanent range improvements. And the permits for the construction of those improvements all, if they are permanent range improvements, provide that the title to those improvements is in the United States. Does the Secretary have to authorize the construction of the permanent improvement ex-ante or does someone with a grazing permit have the right to, for example, erect fences without securing first specific permission about erecting fences? They have to be permitted in the first place. Ordinarily, those permissions will be incorporated into grazing permits and the existing permanent range improvements, which are titled to the United States following the expiration of prior permits, do need to be maintained. Maintenance of permanent range improvements on lands to which an individual may hold a permit is a permit requirement and therefore H was on the land subject to his agreement to maintain those improvements. He was not entitled to any ownership on that basis either. So as a matter of law, all of the takings and all of the compensation that was awarded here was not justified. H failed to state a claim as to any of the three categories of compensation for which compensation was granted. And if the Court has no further questions, I will reserve the remainder of my time. Thank you. We'll save the rest of your time, Ms. Peterson. Mr. Bedford. Thank you, Your Honor. Your Honor, this case is really not about grazing per se. Really, this case is analogous to a case where a city owns water rights up in the mountains on Forest Service land. They have either a pipe or a flume that conveys that water down to the city so it can service the inhabitants. In this case, we have water rights, which I don't think anyone disputes, some 17,000 acre feet that before all this happened were carried in ditches down to the patented lands owned by the H family. Well, we know the story, and we have arguments from the government that the Court of Federal Claims decision was wrong, both with respect to regulatory taking and physical taking. Why don't you tell us why the government's position is incorrect and the claims court's was correct? Well, certainly, there's more than enough in the record to support Judge Smith's conclusion that there was a regulatory taking of the irrigation water belonging to the Hages. But he didn't apply for a permit, did he? No, but Judge Smith found... And that was futile. Futile and the conditions that the Forest Service would impose were unreasonable. Well, there is certainly testimony in the record, in the appendix, and I would refer you to page A1028 of the appendix, that Mr. Hage was told that if he applied for a permit, he would only be allowed to use hand tools to maintain those ditches. It is also clear in the record that there were 25.5 miles of these ditches that brought water down to the patented lands that it would be impossible to maintain with hand tools. As I think Judge Smith found, it would take hundreds of workers forever to maintain those ditches with hand tools. Can you show me where the testimony expressly says that even with a permit, he would only be allowed to use hand tools? Because on manuscript page 108, he's talking about using a little B4 cat to do reparation, starting in 1978-79. And throughout a lot of this time period, he obtained a special permit, and by his own testimony, used larger than hand tool equipment at the same time, and the government didn't seem to object. So where is the testimony that he believed, if he went in in 1980-something and asked for a permit, it would only limit to hand tools? I'm sorry, I didn't mean to interrupt. That's okay, please go ahead. I believe it's appendix page 1281. 1281? Yeah, in which he was told by the Forest Service that he would have to use hand tools to maintain his irrigation ditches. Well, I'm on 1281, and that is the letter received from the Forest Service. Where does it say that with a special use permit, he would only be allowed to use hand tools? I don't think it mentions the term permit. It says, all uses of National Forest System land are designated special uses and must be authorized by an authorized officer. Where does it say that he would be limited to hand tools, if he got authorization? It says the apparent unauthorized cutting of trees would be improper. So it doesn't say you are not authorized to cut trees. It just says you have to get authorization first. This is 1281, right? This is appendix page 1028. Oh, I'm sorry, you directed me to 1281 just now. Oh, I'm sorry, that was my error. Okay, now you want me to look at 1028. Are you referring to the transcript page 109? I am indeed. On 1028, lines 15, 16, 17. Right. Now, so under their rules and regulations, then they said the only kind of maintenance we could do had to be with hand tools. But is he saying that that's the only kind of maintenance he could do with a permit? Or that's the only kind of maintenance he can do without a permit? I don't know. I don't know. But the problem is that the record doesn't have substantial evidence to support the idea that with a permit, he would also only be entitled to using hand tools. It's not your only ground, but it's just one of them that you're talking about now. Correct. Okay, so why don't you? I would also like to proceed by saying, even though Judge Smith found a regulatory taking using the three prongs of Penn Central, in fact, I believe the facts of this case show that, indeed, we have a physical taking of the Hages irrigation water. Are you moving to the fences argument now? I'm sorry? Are you moving now to the electric fence? No. Oh, I'm sorry. No, I'm not moving to the electric fence. I'm talking about the fact that Mr. Hage was prevented by prosecution and threats of further prosecution from maintaining his ditches. Without a permit. Without a permit. Right. But as Judge Smith noticed, this is a mining act of 1866 ditch. It was Mr. Hage's, or at least the property of Mr. Hage's predecessors, long before the Forest Service ever came into existence, long before the BLM was ever formed. But you know that Judge Smith expressly said that he believed it was appropriate for the Forest Service to regulate the land that belonged to the federal government, and in particular he thought it was okay for them to, for example, have permit requirements. If they're reasonable. He did make it very clear that the conditions of the permit had to be reasonable, and he found very specifically that they were not reasonable. Because of the hand tool. Because of what? Because of the hand tool limitation. Yes, yes. And I believe that the Forest Service's riparian vegetation policy triggered a physical takings analysis under Casillas. I know that Judge Smith didn't go there, but I believe that under Casillas, where a restriction on private water use terminates the only private interest, a physical takings analysis is properly applied. And clearly, the record is full of testimony, documentary evidence, that because of the policies employed by the Forest Service, the amount of water did not, the amount of water that should have reached the Hague's patented properties for irrigation purposes didn't. And that was because of upland vegetation, pursuant to Forest Service policies, and the lack of the ability to maintain the ditches. Mr. Bedford, don't you have a problem with respect to the statute of limitations on the physical taking with respect to the fences that were erected, the early fences? You know, that could be argued, but in the context of what was awarded, it's de minimis. As I think I pointed out in my brief, we're talking about just a few acre feet of water, worth at most maybe $7,000. Well, how about the later ones? Weren't the fences ineffective because the animals trampled them down? Well, the animals that trampled them down were the elk that were put on the Table Mountain allotment by the Forest Service and the Nevada Department of Wildlife. It wasn't the cattle that were trampling those fences down, and it's clear in the record it was the elk that were tearing the fences down. Didn't that mean there was no effective taking? Well, no, and that's not when the fences were up. Of course there was a taking. This amounts to a physical taking. As you know, in the Loretto case, it doesn't really matter how brief or how small the taking is. There's a taking. But how do you get around the Colvin cattle case which suggests that there isn't a right to physical grazing on federal land necessarily attaching to a water right? This is so... We're not claiming grazing rights without a permit, as in Colvin. There's really four basic differences between this case and Colvin. In fact, Judge Smith goes to some length to specifically distinguish the Hage case from Colvin. Mr. Colvin was grazing with no permit. Mr. Colvin involved... The situation with Mr. Colvin involved stock water only. There was no land under irrigation. There was no irrigation water, such as we have here. But the physical fences were not prohibiting the irrigation water that was used by the Hages for agricultural use, right? The physical fences were only prohibiting the cattle from entering that land and drinking. So that's not the irrigation... Forgive me, I don't know. But when they talk about irrigation water or agricultural use, I'm assuming that's for farming type things as opposed to cattle drinking water? Right. I might not know the nomenclature. What the water was used for, it was brought down these ditches and applied to raise hay on these roughly 7,000 acres that the Hages owned. But the fences couldn't... An electric fence couldn't have stopped that though, right? The electric fence couldn't have prohibited... The electric fence only prohibited the cattle... From drinking, right. But that's so different from Colvin because these fences were erected while Mr. Hage still had a grazing permit. And those fenced areas were not removed from the boundaries of the allotment. So in Colvin, there was no permit, stock water only. Got irrigation water there. And Hage, not in Colvin, and it's really a totally different situation. Mr., despite the fact that the government would like to paint that picture, Mr. Hage was not a scofflaw. He was grazing his cattle with a valid permit. He made, I think, more than superhuman efforts to comply with the directives that he was being given by the Forest Service and by the BLM, ultimately to no avail. Now quickly on the range improvements that Council for the United States mentioned. I think those range improvements are... I think... The record is full of reference to the range improvements, talking about the report of Dr. Angus McIntosh. We're talking about the testimony of Wayne Hage. The United States tries to paint the picture that these range improvements were not constructed or placed by the Hages, and that they were compensated for all the range improvements on the ranch. That's not true, as we point out in our brief. The total computed depreciated value of the range improvements was $2,454,925. And Judge Smith only awarded $1,517,539, which obviously took into effect the range improvements which were neither constructed or replaced by the Hages. Thank you. Thank you, Mr. Bedford. You wanted to save a couple of minutes for your rebuttal on cross-appeal, and if there's something that the government says on that issue, we'll give you a minute. Thank you. Ms. Peterson, you have rebuttal time. Thank you, Your Honor. With respect to whether the permit requirements were reasonable in Mr. Hage's permit, the question would have to be an Administrative Procedure Act question if he objected to the nature of the terms of his permits. Instead, he just defied them, and the record shows the United States making repeated efforts to get compliance. In other words, he should have accepted the permit with what he regarded as unacceptable conditions and challenged it in a district court. If he considered the permit terms unreasonable. And instead, what happened here was that he defied those permit terms and was... You know, that's a lot of process to expect sort of your average person to go through to secure rights. I mean, for example, what Mr. Hage has claimed to range improvement, I understand the government's argument to be that the initial value of reasonable compensation should be determined by the Secretary. But when you have no procedures in place that would let the average person know how to do that or how the process would work, what's wrong with him filing the lawsuit ultimately and saying, well, I'm seeking compensation for my range improvement? First off, this court's decision in Colvin Cattle, which holds that he didn't have a right to claim until he had sought compensation from the Secretary. Secondly, he didn't have any permission to make permanent improvements on federal rangelands without a permit, and he therefore wasn't entitled to any compensation. Under the regulations, he also wasn't entitled to any compensation where he waived his permit by selling his cattle. So he had no entitlement to compensation. Had he been in the category of people for whom compensation is available for the remaining interest in authorised permanent range improvement when a permit is terminated, he would have been advised of that process because the Forest Service would have been the person terminating the permit before its expiration date. If the process there would have advised him of any appropriate procedures for him to claim compensation, he wasn't entitled to any compensation and there was no appropriate process. So would maintenance of fences or something like that not be a range improvement? I mean, if the fence is so deteriorated that it simply isn't even working anymore and he has to go in and tear it out and put a new fence in, is that not considered a range improvement? Fences are range improvements. That's one of the primary range improvements, but his obligation to keep them maintained and in workable condition was a term for his permit. He was subject to that requirement for the privilege of grazing on federal lands. Then why couldn't he seek compensation for having done that? Because compensation is available only... This is statutory compensation and it's available only where a permit is terminated in order for the government to put the land to a different public use and it's available only for the remaining value of the permittee's interest in the improvement when that termination occurs, before the termination date of the permit. So he didn't have the right... He didn't have any entitlement to compensation for any of that work. That work was part of the compensation he was paying for the privilege of using federal lands. And my time is long up. I apologize. That's quite all right. Thank you, Ms. Peterson. And there's nothing further to say in the cross-appeal. We have you briefed. So the case will be taken under advisement.